## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KEITH FUQUA, an individual;<br>STACY FUQUA, an individual,<br>on behalf of themselves and all others<br>similarly situated,<br><br>     Plaintiffs,<br><br>vs.<br><br><br>LINDSEY MANAGEMENT CO., INC.,<br>and DOES 1 through 10, inclusive,<br><br>    Defendants.<br>_____ | Case No. 5:07-CV-00827-HE<br><br>**CLASS ACTION**<br><br>Case assigned to the Honorable Joe<br>Heaton<br><br>Action Filed on June 29, 2007<br>Action Removed on July 25, 2007 |

Each row of parenthesis `)` appears between the two columns.

### AFFIDAVIT OF TERRY WEST

I, Terry West, Esq., of lawful age, being first duly sworn, do depose and state as follows:

1. Attached hereto as Exhibit A, is a true and correct copy of the lease agreement entered into by Plaintiffs Keith and Stacy Fuqua to lease an apartment at a complex known as the Greens at Moore.

2. Attached hereto as Exhibit B, is a true and correct copy of Defendant Lindsey Management Company's Responses to Plaintiffs' Second Set of Interrogatories.

3. Attached hereto as Exhibit C, is a true and correct copy of the Management Agreement entered into between Lindsey Management Company and the Greens at Moore, which was produced by Lindsey Management Company in discovery.

4.     Attached hereto as Exhibit D, is a true and correct copy of the Affidavit of D. Scott Rogerson, President of Corporate Operations and Chief Financial Officer for Lindsey Management Company, dated July 25, 2007.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 31 day of March, 2008, in _____Shawnee_____, Oklahoma.

**Further affiant sayeth not.**

_____
Terry West, Esq.

# EXHIBIT A

Attn: Jeff Crandall     (208) 667-1939     Page (1)

**APARTMENT LEASE CONTRACT (OKLAHOMA)**

Date 1/1/05
(When form is filled out)

**PARTIES.** This lease is between Stacy and Keith Fuqua
and The Greens at Moore (Resident),
Apartment No. 204 at 1111 S. Santa Fe (Owner) on
Oklahoma, for use as a private residence only. The term "Resident" in this lease refers to all Residents listed above, unless in Moore
otherwise stated. The term "Owner" will include Owner's authorized representatives.

**OCCUPANTS.** The apartment will be occupied by Resident and: (list all other adults and minors) _____

No other occupants are permitted, other than occasional guests. A guest will be considered an unauthorized occupant, rather than an occasional guest, if (a) the guest has been evicted by Owner or asked to leave the premises due to a violation of Owner's Rules and Regulations; (b) the guest is on the premises for any five (5) consecutive days or any eight (8) nonconsecutive days in any calendar month unless Resident has received prior written approval from Owner's representative; or (c) the guest has been convicted of a crime involving violence, sexual abuse or theft of property.

**OCCUPANCY STANDARDS.** Occupancy is limited to no more than two persons per bedroom. Children under age two at the time the lease (or extension or renewal) is executed will not be counted toward this limit. Three adults may occupy an apartment only if all three are related to each other by blood or marriage. Occupancy by more than three adults is not permitted.

**OWNER'S RIGHT TO MODIFY APARTMENT.** Owner reserves the right during the lease term and any extension or renewal thereof to make such modifications to the apartment and common areas as may be necessary to comply with requirements of the Fair Housing Act and Americans With Disabilities Act.

**NO SUBLETTING.** Subletting, assignment, replacements, or change of Residents or occupants will be allowed only upon Owner's prior written consent. In such event, Resident remains fully liable hereunder but shall receive credit for all rentals paid by succeeding Residents.

**2. LEASE TERM.** The initial term of the lease shall commence on the 4th day of November, 2005 and the 28 day of October 2006.

**MOVE-OUT NOTICE AND EARLY MOVE-OUT.** At least 30 days' written notice of intent to move out must be given to Owner's representative. Verbal moveout notice is not sufficient under any circumstances. Owner's form for written move-out notice should be used. If Owner's move-out form is not used, Resident shall be responsible for obtaining written acknowledgment from Owner's representative that move-out notice has been received. Resident's written move-out notice must terminate the lease on the last day of the month following the next rental due date after the notice. If Resident moves out without rent being paid in full for the entire lease term or renewal or extension period, Resident will be liable under paragraph 19 for liquidated damages, and for unpaid rent or late charges which accrue during any month in which Resident occupies the apartment, for property damages caused by the Resident, and for cleaning and painting charges.

In no event may Resident's written move-out notice terminate the lease sooner than the end of the lease term or renewal or extension period.

**4. HOLD-OVER AND AUTOMATIC RENEWAL.** Resident agrees to give Owner thirty (30) days' written notice prior to the termination of the initial lease term stating that Resident does not desire to renew this lease. In the event that a timely notice is not given by Resident within the period prescribed or, after having given notice, Resident shall remain or continue to be in possession of the leased premises or any part thereof after the end of the lease term or any extension thereof, Owner may at its option; (a) treat such holding over as a renewal by Resident of all provisions of this lease except as to term and rental, which term shall be for a period equivalent to the immediately preceding lease term and which rental shall be at the then prevailing rental charges of Owner for substantially the same type of apartment. In the event Owner elects to treat such holding over as a renewal, each and all of the other covenants and conditions of this lease shall be and remain in full force and effect; or (b) refuse to renew the lease, in which event Owner shall give Resident three (3) days' notice to vacate the premises. Owner may proceed to let the premises to another resident and charge Resident for any damages resulting from Resident's failure to deliver possession on the date of termination, in addition to any other rights accruing to Owner hereunder. Resident shall be liable to pay rents for the holdover period and to indemnify Owner and prospective residents for damages (including lost rentals, lodging expenses, and attorney's fees). Holdover rents shall be immediately due on a daily basis and delinquent without notice or demand.

**5. SECURITY DEPOSIT.** Resident agrees that the security deposit(s) will be the total sum of $250 ᶜᶜ payable on or before signing of this lease. Refunds shall be made in accordance with this lease. Resident is prohibited by statute from applying security deposit(s) to rent. The full monthly rent shall be paid on or before the due date of each month, including the last month of occupancy.

**6. RENT.** Resident will pay $ 1,840 ᶜᶜ rental for the lease term, payable in the following manner: (a) prorated rent from commencement date to the first day of next month in the amount of $ __ and (b) 11 ½ installments of $ 510 ᶜᶜ in advance and without demand at the apartment manager's office with the first monthly installment due on the __ day of November 2006 , and __ additional installments of the same amount due on the first (1st) day of each month thereafter until paid in full. Rent unpaid after the due date is delinquent and will authorize all remedies in this lease, particularly paragraph 19. If all rent is not paid on or before the third (3rd) day of the month (the late charge date), Resident agrees to pay a late charge of $20.00. Resident acknowledges that Owner incurs additional costs in collecting late rental payments and that it is more difficult to Owner to meet its financial obligations when rents are not paid on time. Resident agrees that Owner's actual damages would be impracticable or extremely difficult to determine and stipulates that the amount of the late fee is a reasonable sum to be assessed as liquidated damages for late payment. Resident agrees to pay a $20.00 charge for each returned check, plus daily late charges from the late charge date until acceptable payment is received by Owner. Pet charges for violating the pet restrictions contained in paragraph 16 of this lease shall be $50.00 for the first day and $10 for each additional day. Resident's right to possession on the condition that rent is paid on time. Payment of rent shall be an independent covenant, and use of the premises by Resident is obtained only applied first to non-rent obligations of Resident, then to rent, regardless of notations on checks. At Owner's option, Owner may at any time require that all rent and other sums be paid in either certified check, cashier's check, money order, or one monthly check, rather than multiple checks. CASH WILL NOT BE ACCEPTED. The above rental figure is for a ___ furnished [X] unfurnished apartment.

Owner's Representative _____
Resident's _____

Page 1 of 5     FORM 102.OK-12.30.94

I - 1

Apr 25 05 08:39a

7. **SPECIAL PROVISIONS.** The following special provisions and any addendum shall control over any conflicting provisions of this printed lease form:

rent by automatic bank draft

Page 2

8. **UTILITIES AND SERVICES.** Resident will be responsible for scheduling the hookup and paying of deposits to the electric, water, gas, telephone and TV cable companies. Resident will at all times keep electric, water (and gas, if applicable) service to Resident's apartment. If such service is discontinued for any reason, Owner may reinstate such service and charge the cost of such reinstatement and utility service to Resident. Residents hereby agree to place waste and garbage in a plastic bag before placing it in the dumpster located on the property. If permitted by law, Owner shall have the right at any time and from time to time to contract for sanitation, telephone or cable television service. Owner shall in no way be liable or responsible for any loss, damage, or expense that Resident may sustain by reason of any change, failure, interference, disruption or defect in the supply or character of such utility service.

9. **RULES AND REGULATIONS.** Resident, Resident's guests, and occupants shall comply with all written rules and regulations, which shall be considered part of this lease. Owner may make reasonable rule changes. Resident agrees that the conduct of Resident and Resident's guests and occupants shall not be disorderly, boisterous, or unlawful, and shall not disturb the rights, comforts, or conveniences of other persons in the apartment community. Resident shall be liable to Owner for damages caused by Resident or Resident's guests or occupants. Sidewalks, steps, entrance halls, walkways, and stairs shall not be obstructed or used for any purpose other than ingress or egress. Resident shall keep the apartment, and any other areas reserved for Resident's private use, clean and sanitary. Resident shall dispose of garbage at least weekly, only in appropriate receptacles. Any swimming pools, saunas, hot tubs, exercise rooms, storerooms, laundry rooms, and other improvements are to be used wholly at the risk of the person using them. Owner may regulate the manner, time and place of all parking. Owner may regulate, limit or prohibit from the apartment or apartment community, the following: motorcycles, bicycles, tricycles, skateboards, recreational vehicles, boats, trailers, grills, patio furniture, furniture movers, deliverymen, solicitors, and guests who in the Owner's reasonable judgment have been disturbing the peace, disturbing other Residents, or violating this lease or apartment rules and regulations. All vehicles parked on the premises must be operable and have valid current license plates. "Operable" means the vehicle must have inflated tires, have all major components intact, including windows and windshields, and be reasonably clean. Any violation of the foregoing will subject the vehicle to being towed at the expense of the vehicle owner or operator. Flashlights (and not candles or kerosene lamps) shall be used if electricity is interrupted or terminated. No business or childcare services may be operated in or from the apartment. Upon payment of a reasonable charge, Resident may require Owner to change (or re-key) a door lock. A Resident who moves out prior to the end of the lease term or renewal or extension period is no longer entitled to occupancy or keys. Keys may not be duplicated without Owner's written consent. All written rules may be enforced through Owner's representatives or agents, and Resident shall hold same harmless from reasonable enforcement.

10. **CONDITION OF THE PREMISES ON MOVING IN AND MOVING OUT.** Resident accepts the apartment, fixtures, and any furnishings as is, except for conditions materially affecting health or safety of ordinary persons. Resident accepts the apartment, fixtures, and any A Statement of Unit Condition and Security Deposit Return form will be provided to Resident upon move-in. Within 48 hours after move-in, Resident shall note any defects or damages on the form and return it to Owner's representative; otherwise, everything will be deemed to be in clean and good condition. Resident accepts the premises subject to any existing or future recorded mortgage or other lien applicable to the premises or its contents. Resident shall use reasonable diligence in care of the apartment. Resident may not make any alterations or improvements to Owner's property without Owner's prior written consent. No holes or stickers shall be put anywhere inside or outside the apartment. No hanging will be permitted in sheetrock walls and in grooves of wood-paneled walls. Alternative picture hanging methods (in lieu of small nails) may be required by Owner's rules and regulations. No antenna or satellite receiver installation, additional phone or cable TV outlets, or lock changes (including re-keying or additions of locks) will be permitted except by Owners prior written consent. Resident will not remove Owner's fixtures or furniture from the apartment for any purpose. When Resident moves in, Owner shall furnish light bulbs of prescribed wattage for apartment fixtures and any lamps furnished by Owner; thereafter, light bulbs will be replaced at Resident's expense. When moving out, Resident agrees to surrender the apartment in good, clean condition, as determined by Owner.

11. **CLASSIFICATIONS OF PROPERTY.** (1) APARTMENT: Subject to the provisions of paragraph 17 herein, the interior of the apartment, and any other areas reserved for Resident's private use, shall be under the exclusive control of the Resident. (2) COMMON AREAS: The balconies, stairways, grounds, parking lots, driveways, and amenities (including, but not limited to, club room, fitness center, pool, playground, tennis court, basketball court, volleyball court, and similar facilities) are common areas for the nonexclusive use and benefit of Owner and all residents. (3) RESTRICTED AREAS: Use and occupancy of the attics, exterior walls, roofs, and ledges are restricted to Owner and any use or occupancy by Resident is prohibited.

12. **LIABILITY.** Owner will not be liable to Resident or Resident's guests or occupants for any damages or losses to person or property caused by other persons, including theft, burglary, assault, vandalism, or other crimes. Owner will not be liable to Resident or Resident's guests or occupants for personal injury or for damage to or loss of their personal property (including, jewelry, clothing, etc.) from fire, flood, water leak, rain, hail, ice, snow, smoke, lightning, wind, explosion, interruption of utilities, or other occurrences unless such injury, loss, or damage is caused by negligence of Owner. Owner strongly recommends that Resident secure insurance to protect against all of the above occurrences. Resident agrees that existing locks and latches are safe and acceptable, subject to Owner's duty to make needed repairs of same upon written request by Resident. Owner shall have no duty to furnish smoke detectors, security guards, or additional locks and latches, except as required by statute. When smoke detectors are furnished, Owner shall test same and initially provide working batteries at lease commencement as required by statute; thereafter, Resident shall pay for and replace smoke detector batteries, if any, as needed. Resident agrees to test the smoke alarm monthly and report any malfunctioning alarm to Owner. If Owner's employees are requested to render services not contemplated in this lease, Resident agrees to hold Owner harmless from all liability regarding same. Residents on premises adjoining or in proximity to golf courses assumes the risk of damage to personal property and personal injury caused by golf balls and agree to hold Owner harmless for any such damage or injury.

13. **MOLD AND MILDEW.** Resident agrees to regularly inspect the Apartment for water leaks, moisture, mold and mildew. Potential sources of water or moisture include roof leaks, humidifiers, plumbing leaks, steam from cooking, watering houseplants, baths and showers. Leaks may occur around water heaters, toilets, sinks, tubs, showers, windows and doors. Discolored areas on walls and ceilings and moisture in carpets may indicate roof leaks or clogged air conditioner drains. Resident agrees to immediately notify Owner in writing if Resident detects leaks, mold or mildew within the apartment. Resident agrees to clean and remove mold and mildew in accordance with cleaning instructions available at the apartment manager's office. If Resident discovers mold and mildew in areas not accessible to Resident for cleaning, Resident agrees to inform Owner so that Owner can remove mold and mildew from those areas.

14. **REQUESTS, REPAIRS AND MALFUNCTIONS.** If you or any occupant need to send a notice or request -- for example, for repairs, installations, services, or security-related matters -- it must be signed and in writing to your designated representative (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, crime in progress, or other equally

Owner's Representative: [signature]

Resident: [signatures]

Page 2 of 15

FORM 132.04-12.2004

Page ③

dire emergency). Resident will notify Owner of emergencies immediately, by the fastest available means. Owner shall have the right to temporarily turn off equipment and interrupt utilities to avoid damage to property or to perform repairs or maintenance which require such interruption. In case of malfunction of air conditioning or other equipment, Resident shall notify Owner's representative as soon as possible on a business day. Owner shall act with reasonable diligence in making repairs; and the lease shall continue and the rent shall not abate during such periods. If damage to the premises from fire or other catastrophe is substantial in the reasonable judgment of Owner, Owner may terminate this lease within a reasonable time by giving written notice to Resident. If the lease is so terminated, rent shall be prorated and the balance refunded along with all deposit(s), less lawful deductions.



15. REIMBURSEMENT. Resident shall promptly reimburse Owner for any loss, property damage, or cost of repairs or service caused in the apartment or community by negligence or improper use by Resident, or Resident's guests or occupants. Owner will not be liable for and Resident shall pay for the following if it occurs during the lease term or renewal or extension period: (a) damage to doors, windows, or screens unless due to negligence of Owner, and (b) repair costs and damage from plumbing stoppages in lines exclusively serving Resident's apartment, and (c) damage from windows or doors left open. Owner's failure or delay in demanding damage reimbursement, late-payment charges, returned check charges, pet charges or other sums due by Resident shall not be deemed a waiver, and Owner may require payment of same at any time, including deduction from security deposit. Owner may require advance payment of repairs for which Resident is liable.



16. NO PETS (ANIMALS). No pets (animals including mammals, rodents, reptiles, birds, fish, and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless Owner has so authorized in writing. No unauthorized pets, stray animals or wild animals may be fed from the apartment or any part of the apartment community. These prohibitions apply to non-pet animals used in a trade or profession. An animal deposit is considered a general security deposit. Owner will authorize a support animal for a disabled person, but may require a written statement from a qualified professional verifying the need for the support animal. Violation of the foregoing by Resident or Resident's guests or occupants, with or without Resident's knowledge or permission, will subject Resident to the charges, damages, and eviction provisions of this lease.

17. WHEN OWNER MAY ENTER. If Resident or Resident's guest or occupant is present, then repairmen, servicemen, or Owner's representatives may enter the apartment during reasonable times for reasonable business purposes. If no one is in the apartment, then repairmen, servicemen, or Owner's representatives may enter at reasonable times by duplicate or master key (or by other means it locks have been changed in violation of this lease) if such entry is for responding to Resident's request; repairs, estimating repair or refurbishing costs; extermination; preventive maintenance; filter changes; inspections; retrieving unreturned tools or appliances; emergency safety or fire inspections; avoiding property damage; preventing waste of utilities; exercising contractual lien; leaving notices; removing or re-keying unauthorized locks or latches; removing unauthorized window coverings; retrieving property owned or leased by previous Residents; showing apartment to prospective Residents (after move-out or vacate notice has been given); or showing apartment to government inspectors, fire marshals, lenders, appraisers, prospective purchasers, or insurance agents. During and in anticipation of sub-freezing temperatures, Owner or Owner's representatives may enter the apartment and turn on heating units to a setting that will keep water pipes from freezing, and allow water to drip from the faucets to avoid property damage. Owner will attempt to give Resident at least one day's notice of intent to enter the apartment except in cases of emergency unless it is impracticable to do so.



18. DEFAULT BY OWNER. Owner agrees to act with customary diligence to: (a) keep common areas reasonably clean, (b) maintain fixtures, furniture, hot water, heating and air conditioning equipment, (c) remain in substantial compliance with applicable federal, state and local laws regarding safety and sanitation, and (d) make all reasonable repairs, subject to Resident's obligation to pay for damages caused by Resident or Resident's guests or occupants. If Owner is in material noncompliance with the terms of this Contract which materially affects health or safety, Resident may terminate this lease only when the following procedures are followed: (1) Resident shall make written request for repair or remedy of the condition, and all rents must be current at such time, (2) the notice shall specify a date not less than thirty (30) days after receipt of the notice if the breach is not remedied within fourteen (14) days, and thereafter the rental agreement shall say terminate as provided in the notice unless the Owner adequately remedies the breach within the time specified. Then the security deposit(s) and prorate rent will be refunded as required by law.



19. DEFAULT BY RESIDENT. If Resident fails to pay rent or other amounts owed by Resident under this lease; or if Resident or Resident's guests or occupants violate this lease or Owner's rules and regulations or applicable federal, state, and local laws, including any violation of criminal laws regardless of whether such violation occurs on or off the premises; if Resident gives any false or incorrect answers in a rental application; if Resident, in bad faith, makes an invalid habitability complaint to an official or employee of a utility company or the government; or if Resident abandons the apartment, then Owner's representative may (with or without demand for performance) terminate Resident's right of occupancy by giving Resident five days' written notice to vacate, and Owner shall be entitled to possession by eviction suit or any other lawful means. Notice may be mailed or personally delivered to Resident or left in a conspicuous place. Termination of possession rights or subsequent relating by Owner shall not release Resident from liability for future rentals under this lease. After Owner gives notice to vacate or after Owner files eviction suit, Owner may still accept rent or other sums due; and such notice, filing, or acceptance shall not waive or diminish Owner's right of eviction or any other contractual or statutory right. Acceptance of monies at any time will not waive Owner's right of property damages, past or future rent, or other sums due. If Resident's rent is delinquent and if five (5) days' prior written notice is personally delivered to Resident, Owner may terminate utilities furnished and paid for by Owner. Owner may report unpaid rental or unpaid damages to local credit agencies for recordation in Resident's credit record.

FALSE INFORMATION. Resident understands that the information provided to Owner in connection with qualification guidelines for Residents of this apartment community are relied upon by Owner in entering into the lease contract. Should the information provided prove to be false, Resident understands that same shall be considered as a material breach of the lease entitling Owner to evict Resident upon five (5) days' written notice.

ACCELERATION. All monthly rentals for the remainder of the lease term of renewal or extension period shall be accelerated automatically without notice or demand (either before or after acceleration) and shall be immediately due and delinquent if, without Owner's written consent: (1) Resident moves out, removes property in contemplation of moving out, or gives verbal or written notice (in person or by co-occupant) of intent to move out prior to the end of the lease term or renewal or extension period, and (2) rentals for the entire lease term and renewal or extension period have not been paid in full. Remaining rents shall likewise be accelerated if Resident is evicted. Such right of acceleration is in lieu of having rental for the entire lease term payable at the beginning of the lease.



LIQUIDATED DAMAGES. Owner and Resident have contemplated and agree that Owner will suffer damages in the event Resident vacates the apartment without having paid rent for the entire lease term, and any extensions thereof, and that the amount of damages will be difficult to ascertain. Owner and Resident agree that, in such event, Owner shall be entitled to recover as liquidated damages an amount equal to one-half of the rent calculated from the first day of the month following the date on which Resident vacates the apartment through the end of the lease term; but in no event shall the amount of liquidated damages exceed an amount equal to three months' periodic rent as provided in the lease contract. Owner and Resident agree that the amount of liquidated damages is in reasonable proportion to the damages the parties contemplate will be incurred by Owner should Resident fail to perform this Lease Contract. The agreed liquidated damages are specifically intended to be reasonable compensation for unpaid rent for the remainder of the lease term, and any extensions thereof, and do not include damages for unpaid rent or late charges which accrue during any month in which Resident occupies the apartment, property damage caused by the Resident, cleaning charges, and painting charges.

Owner's Signature(s) [signature]     Page 3 of 3     FORM 182,04-12,00-04

Resident(s) [signature]

P. 2

Page (9)

 20. ABANDONMENT/LIEN: If Resident abandons or surrenders possession of the apartment and leaves household goods, furnishings, fixtures, or any other personal property in the apartment, Owner may take possession of such property and dispose of it as provided by 41 Okla. St. Ann Section 130. Resident agrees that Owner may consider Resident has abandoned the premises if 1) the electricity or water in Resident's apartment has been disconnected either at the request of Resident or for nonpayment, and 2) Owner posts a notice in or on Resident's apartment and Resident fails to respond to such notice within five (5) days. Owner shall have a lien on Resident's property located in the apartment for proper charges owed by Resident, as provided by 41 Okla. St. Ann. Section 133.

21. FORWARDING ADDRESS. A written copy of each Resident's forwarding address shall be left with Owner or Owner's representative and with the U.S. Postal Service.

## DEDUCTIONS FROM TOTAL SECURITY DEPOSIT

 22. CLEANING. The apartment, including furniture, bathrooms, and kitchen appliances, must be cleaned thoroughly. MOVE-OUT CLEANING INSTRUCTIONS (available in apartment manager's office) shall be followed. If Resident fails to clean in accordance with the move-out cleaning instructions, reasonable charges to complete such cleaning shall be deducted. This includes charges for cleaning carpets, window coverings, furniture, painting walls, etc., plus any utility expenses incurred because of such cleaning. It is understood by Resident that Owner has cleaned the carpets and painted the apartment in advance to Resident occupying the apartment. It is also understood by Resident that Owner will clean the carpets and paint the apartment when Resident moves out. This charge will be deducted from Resident's security deposit.

 23. FIXED CLEANING CHARGE. The following minimum charge will be deducted in any event for cleaning which Owner requires to be done commercially or by Owner's employees: $ 150.00 _____ This charge does not relieve Resident from the cleaning provisions of paragraph 22 above.

24. OTHER DEDUCTIONS. Resident shall be liable for and appropriate charges will be deducted for any unpaid sums due under the lease; unpaid rent; unpaid utilities; unreimbursed service charges; damages or repairs to the apartment or its contents (beyond reasonable wear); utilities for repairs; trips to let in company representatives to remove Resident's telephone or TV cable services or rental items (if Resident requests same or has moved out); trips to open apartment when Resident has lost or forgotten key; key duplicates; unreturned keys; insufficient light bulbs; stickers; scratches; burns; stains, or unapproved holes; removing or re-keying unauthorized locks or latches; agreed costs-of-reletting; packing, removing or storing property removed or stored pursuant to paragraph 20; removing illegally parked vehicles; late payment and returned check charges; attorney's fees, court costs, and deductions; if keys are not returned or if rent has been accelerated under paragraph 19 or if Resident is evicted, charges may be made for change of door locks and new keys. Security deposits will be first applied to non-rent items, then to unpaid rent.

If for any reason Resident is evicted, fails to complete the lease term or fails to give notice as required under paragraph 3, there will be no refund of Resident's security deposit.

 25. INSPECTION UPON MOVE-OUT. Resident is urged to make an appointment with Owner's representative for move-out inspection of the apartment, using MOVE-IN and MOVE-OUT inventory and condition forms. Estimates or commitments by Owner's representative regarding amount or deductibility of repairs, damages, or charges are subject to subsequent correction, modification or disapproval by Owner before final refunding or accounting..

 26. RETURN OF DEPOSIT. After lawful deductions have been made, the balance of all security deposits and an itemized accounting of any deductions will be mailed to Resident no later than 30 days after surrender except where otherwise provided by statute. For purposes of determining relinquishment of possession, damages, clean-up charges and other deductions, "surrender" shall occur on the latest of the following dates: (a) when all keys have been turned in, (b) when move-out date has expired and all Resident live elsewhere, or (c) when it reasonably appears that all Residents have permanently moved out.

## MISCELLANEOUS

 27. MULTIPLE RESIDENTS OR OCCUPANTS. Each Resident and each Resident's share of the total security deposit is jointly and severally liable for all obligations and sums due under the lease. Violation of the lease by Resident or Resident's guests or occupants shall be considered a violation by all Residents. Notice by Owner's representative to one Resident constitutes notice to all Residents. Entry, permission or service request from any Resident, occupant, or guest shall be deemed to be from all Residents. The balance of all security deposits may be refunded in one check jointly payable to all Residents; and such joint refund check and/or itemization of deductions may be mailed to one Resident only.

 28. DELAY OF OCCUPANCY. If occupancy is or will be delayed because of construction or prior resident's holding over, Owner shall not be liable to Resident for such delay, and the lease shall remain in force subject to (1) abatement of rentals on a daily basis during delay, and (2) Resident's right to terminate as set forth below. Notice of such termination must be in writing. After such termination, Resident shall be entitled only to refund of deposit(s) and any rentals paid. Resident's above right of rent abatement or lease termination shall not apply if delay is due to cleaning or repairs which do not prevent occupancy by Resident.

NOTICE OF ANTICIPATED DELAY. If Owner gives written notice to any one of the Residents listed in paragraph 1 before lease commencement date and if such notice states that construction delay is anticipated and the apartment will be ready for occupancy on a specific date, Resident may terminate the lease within 7 days after any one of such Residents receives such written notice, but not thereafter.

NOTICE OF ACTUAL DELAY. If Owner gives written notice to any one of the Residents listed in paragraph 1 on or after lease commencement date and if such notice states that occupancy has been delayed because of construction or a prior resident's holding over and the apartment will be ready for occupancy on a specific date, Resident may terminate the lease within 3 days after any one of such Residents receives such written notice, but not thereafter.

NEW COMMENCEMENT DATE. A readiness date given by Owner to Resident in writing shall be considered the new lease commencement date for all purposes, including the right of Resident to terminate under this paragraph if the apartment is not ready on such new commencement date. Such new commencement date may never be moved to an earlier date except by mutual agreement of Owner and Resident.

NO NOTICE OF DELAY. If holdover or construction delay actually occurs and if Owner has not given notice of delay under one of the above paragraphs, Resident may terminate up to the date the apartment is ready for occupancy, but not thereafter.

 29. RELEASE OF RESIDENT. Except as provided under the military clause below, Resident will not be released on grounds of voluntary or involuntary school withdrawal or transfer, voluntary or involuntary business transfer, marriage, divorce, reconciliation, loss of co-Residents, bad health, death, voluntary enlistment in the armed services or any other reason, unless otherwise agreed in

Owner's Representative _____
Residrent(s) _____

FORM 102 OK-12 23-04

p. 5

APR 25 05 08:41a

Page 5

paragraph 8. However, if Resident secures a replacement satisfactory to Owner's representative, Resident's liability for future rentals will be reduced by the amount of rentals actually received from such replacement. If Resident is or becomes a member of the Armed Forces on extended active duty and receives change-of-station orders to permanently depart the local area, or is relieved from such active duty, then Resident may terminate this lease by giving notice to Owner or Owner's representative. Such notice shall effectively terminate the lease 30 days after the next monthly rental payment is due. In such event, Resident agrees to furnish Owner a copy of the official orders which warrant termination of the lease. Military permission for base housing does not constitute a permanent change-of-station order. After move-out, such Resident shall be entitled to return of security deposit(s), less lawful deductions.

RENT INCREASES. The following shall apply unless otherwise specified in paragraph 7. Owner reserves the right to institute periodic rent increases. Resident will receive a written 30-day notice of rent increase. No rent increases shall be allowed during the lease term.

COPIES. Resident acknowledges receipt of a copy of this Lease Contract. A copy of Owner's rules and regulations, if any, will be furnished when Resident moves in, or earlier if desired. When a Statement of Unit Condition and Security Deposit Return form is completed after Resident moves in, both Resident and Owner should retain a copy.

PEST CONTROL. Although Owner will periodically treat the premises for pests, Resident assumes the responsibility for keeping the premises free of infestation by roaches, water bugs, rodents, moths, and other pests, and assumes the risk of all damages therefrom, and Owner shall not be liable or responsible for damages or injury to furnishings, wearing apparel, or personal belongings of the Residents or other occupants of the premises from such sources.

INSPECTION. Owner reserves the right to make an inspection of the apartment every six months or any other time as Owner may reasonably deem necessary.

SUBORDINATION. This lease shall be subject and subordinate to any mortgage that is now on or affects the leased premises or that any Owner of the premises may hereafter at any time elect to place on such premises, and to all advances already made or that may be hereafter made on account of any such mortgage, to the full extent of the principal sums secured thereby and interest and fees thereon. Furthermore, Resident shall on request hereafter execute any documents that Owner's counsel may deem necessary to accomplish such subordination of Resident's interest in this lease, in default of which Owner is hereby appointed as Resident's attorney in fact to execute such documents in the name of Resident, and this authority is hereby declared to be coupled with an interest and irrevocable.

WAIVER. Failure by Owner to exercise any option herein contained upon breach by Resident shall not constitute a waiver of Owner's right to exercise such option upon any further breach.

SERVICE OF PROCESS/AUTHORIZED REPRESENTATIVE. Notices to Owner under this Lease Contract may be delivered to the on-site manager at the apartment community's leasing office. Service of legal process may be made on Owner's agent, Lindsey Management Co., Inc., c/o Roy Stanley, President, 1165 Joyce Boulevard, Fayetteville, Arkansas 72703.

COMPLETE AGREEMENT. It is agreed that neither party hereto is relying upon any oral or written information or representation of the other party and that this Lease Contract constitutes the entire agreement between the parties and shall not be hereafter amended or modified except by written agreement signed by Resident and Owner.

SEVERABILITY. In the event any provision of this Lease Contract is declared to be invalid for any reason, it shall not affect the validity of any other provision of this Lease Contract.

GOVERNING LAW. This Lease Contract shall be governed by the laws of the state of Oklahoma.

BINDING AGREEMENT. Resident hereby acknowledges that all terms, conditions, covenants, agreements and representations herein are binding upon and shall inure to the benefit of the parties hereto, jointly and severally, their respective heirs and assigns.

NO SECURITY DEPOSIT WILL BE REFUNDED UNLESS A 30-DAY WRITTEN NOTICE IS GIVEN BY RESIDENT AND RESIDENT HAS FULFILLED THE TERMS OF THE LEASE.

THIS IS A BINDING LEGAL DOCUMENT -- READ CAREFULLY BEFORE SIGNING.

Resident Signature & Social Security No.
(All Residents must sign here)

_____ SSN: 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

_____ SSN 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

_____ SSN: _____

Owner or Owner's Representative

The Greens at Moore

_____

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

RECEIVED

NOV 1 9 2007

BY:_____

KEITH FUQUA, an individual; )
STACY FUQUA, an individual, )
on behalf of themselves and all others )
similarly situated, )
                             )
        Plaintiffs, )
                             )
v.                            )     Case No. CIV-07-827-HE
                             )
Lindsey MANAGEMENT CO., INC. and )
DOES 1 through 10, inclusive, )
                             )
        Defendants. )

## DEFENDANT LINDSEY MANAGEMENT CO., INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

Defendant Lindsey Management Co., Inc. ("Lindsey") submits the following responses and objections to the Second Set of Interrogatories (the "interrogatories") submitted by plaintiffs Keith and Stacey Fuqua ("Plaintiffs").

### GENERAL OBJECTIONS AND CONDITIONS

The following general objections and conditions qualify, and are incorporated by reference into, each and every applicable response to the interrogatories:

1.    Lindsey objects to each instruction, definition and interrogatory to the extent it purports to impose obligations or requirements upon Lindsey beyond those imposed by the Federal Rules of Civil Procedure. Lindsey will respond to the interrogatories in accordance with applicable procedural statues and rules.

2.    Lindsey objects to each interrogatory to the extent it seeks information revealing or constituting the work product of Lindsey's attorneys, because such information is exempt from discovery.



3.     Lindsey objects to each interrogatory to the extent it seeks information revealing or concerning communications between Lindsey and Lindsey's attorneys or confidential communications between representatives of Lindsey and Lindsey's attorneys made for the purpose of facilitating the rendition of professional legal services to Lindsey, because such information is protected by the attorney-client privilege.

4.     Lindsey objects to each interrogatory, which seeks to obtain information containing or relating to trade secrets or other confidential proprietary information of Lindsey without an appropriate protective order.

5.     Lindsey objects to all definitions, instructions and interrogatories that incorporate factual allegations or legal conclusions that are disputed by Lindsey.

6.     The responses made to the interrogatories in no way waive: (a) any objections by Lindsey as to the competency, relevancy, materiality, privilege or admissibility of such responses or related documents or to the subject matter thereof; (b) Lindsey's right to object to the use of such responses or any related documents, or to the subject matter thereof, in any proceeding, including the trial of this or any other action; or (c) Lindsey's right to object to any other document request or interrogatory or to any request for further responses to these interrogatories.

7.     Lindsey reserves the right to supplement and/or amend these objections and responses after further investigation and discovery.

### OBJECTIONS AND RESPONSES TO SECOND SET OF INTERROGATORIES

**INTERROGATORY NO. 1**:     Please state all facts upon which you base your statement in Paragraph 1 of Defendant's Answer that Lindsey Management Co., Inc. did not enter into ""residential lease agreements or 'Apartment Lease Contract' with Plaintiffs or any putative class members in any state."

**ANSWER TO INTERROGATORY NO. 1**:     Plaintiffs and the putative class members allegedly reside or did reside at residential apartment properties managed by Lindsey in the States of Alabama, Arkansas, Kansas, Mississippi, Missouri, Nebraska, Oklahoma, Tennessee and Texas. While Lindsey does manage certain residential apartment properties in the above-referenced states, the properties it manages are owned by other entities. The residential lease agreements for the properties managed by Lindsey in the above-referenced States are entered into by the lessees and the persons and/or entities that own the properties in question. For example, the parties to the residential lease agreement attached to Plaintiffs' Petition are the Plaintiffs and The Greens at Moore, a Limited Partnership. Lindsey is not a party to any residential lease agreement at any of the residential apartment properties it manages in the above-referenced States.

**INTERROGATORY NO. 2**:     Please identify (by name, title, address, and telephone number) all persons with knowledge of the facts upon which you base your statement in Paragraph 1 of Defendant's Answer that Lindsey Management Co., did not enter into ""residential lease agreements or 'Apartment Lease Contract' with Plaintiffs or any putative class member in any state."

**ANSWER TO INTERROGATORY NO. 2**:     Lindsey objects to this interrogatory as being overly broad and unduly burdensome in requesting the identification of "all persons with knowledge" of the fact in question. There are literally thousands of lessees at the residential apartment properties managed by Lindsey and dozens of Lindsey employees who would have knowledge of these facts. Subject to this objection, Lindsey President of Corporate Operations and Chief Financial Officer D. Scott Rogerson, % of Lindsey Management Co., Inc., is knowledgeable of the facts upon which Lindsay bases its statement in Paragraph 1 of

Defendant's Answer that Lindsey did not enter into "residential lease agreements or 'Apartment Lease Contract' with Plaintiffs or any putative class member in any state."

**INTERROGATORY NO. 3**:       Please identify (by title, date, description and whereabouts) all documents which support your statement in Paragraph 1 of Defendant's Answer that Lindsey Management Co., Inc. did not enter into "residential lease agreements or 'Apartment Lease Contract' with Plaintiffs or any putative class member in any state."

**ANSWER TO INTERROGATORY NO. 3**:       Lindsey objects to this interrogatory as being overly broad and unduly burdensome in requesting the identification of "all documents" supporting such statement. As referenced above, there are over twenty-five thousand residential lease agreements that would support Lindsey's contention. Lindsey objects to identifying or producing all such agreements on the basis that it would be overly burdensome. However, subject to a mutually agreeable protective order and without waiver of either Defendant's objections or Plaintiffs pursuing a subsequent request for copies of additional lease agreements and other documents, the parties have agreed that Defendant will produce ten (10) copies of lease agreements, executed before May 1, 2007, from each of nineteen (19) selected residential apartment properties managed by Lindsey, eight (8) properties of which are located in Arkansas, four (4) properties of which are located in Oklahoma, and one (1) property located in the states of Missouri, Texas, Tennessee, Mississippi, Kansas, Nebraska and Alabama, for a total of 190 lease agreements. For each property in each state, the last name(s) of the ten (10) lessees will begin with the letter "B". If there are no lessees or insufficient lessees at a property whose last names begin with "B", then lessees with last names beginning with the letter "C" will also be produced, and continuing alphabetically thereafter until ten (10) lease agreements are collected and produced for each of the nineteen properties.

**INTERROGATORY NO. 4**:      Please describe your involvement with the "LMC apartment communities" (as that term was understood by you in preparing Defendant's Answer).

**ANSWER TO INTERROGATORY NO. 4**:      Lindsey objects to this interrogatory as being vague and ambiguous for failing to define the type of involvement to be described. Subject to its objection, Lindsey states that it manages over one hundred residential apartment properties on behalf of nearly one hundred entities that own the properties. The Management Agreements set out in detail the duties of Lindsey with regard to the management of each property. Subject to a mutually agreeable protective order, Lindsey will produce the Management Agreements for the residential apartment properties.

**INTERROGATORY NO. 5**:      Please identify (by name, title, address, and telephone number) all persons employed by, contracted by, or otherwise affiliated with you who were involved in the activities described in response to Interrogatory No. 4 herein.

**ANSWER TO INTERROGATORY NO. 5**:      Lindsey objects to this interrogatory as being overly broad and unduly burdensome in requesting the identification of "all persons" involved with such activities. Lindsey further objects to this interrogatory as being vague and ambiguous in defining the persons for whom identification is sought. There are over 150 Lindsey employees who are responsible for carrying out Lindsey's duties under its Management Agreements with the entities that own the properties. Lindsey President of Corporate Operations and Chief Financial Officer D. Scott Rogerson is generally knowledgeable of the persons employed by, contracted by, or otherwise affiliated with Lindsey who perform services under the Management Agreements.

**INTERROGATORY NO. 6**:      Please describe your role in preparing, revising, and/or otherwise drafting the "Apartment Lease Contracts" (as that term was understood by you in preparing Defendant's Answer).

**ANSWER TO INTERROGATORY NO. 6**:      Lindsey employees assisted legal counsel in drafting and revising the lease agreements used at the residential apartment properties managed by Lindsey.

**INTERROGATORY NO. 7**:      Please identify (by name, address, and telephone number) all persons and/or entities with an ownership interest in the "LMC apartment communities" (as that term was understood by you in preparing Defendant's Answer).

**ANSWER TO INTERROGATORY NO. 7**:      Pursuant to Fed. R. Civ. P. 33(d), Lindsey will produce, upon entry of an agreeable protective order, a list of the owners of the residential apartment properties currently managed by Lindsey.

**INTERROGATORY NO. 8**:      Please describe your relationship to each of the persons and/or entities identified in response to Interrogatory No. 7 herein.

**ANSWER TO INTERROGATORY NO. 8**:      Lindsey is an independent contractor who manages residential apartment properties under a Management Agreement for the owners described in Answer to Interrogatory No. 7.

**INTERROGATORY NO. 9**:      Please identify (by title, date, description and whereabouts) all documents which constitute, show or reflect your involvement with the "LMC apartment communities" (as that term was understood by you in preparing Defendant's Answer).

**ANSWER TO INTERROGATORY NO. 9**:      Lindsey objects to this interrogatory as being overly broad and unduly burdensome in requesting "all documents which constitute, show or reflect" such involvement. Lindsey further objects to this request as being vague and

ambiguous by failing to define the type of involvement relevant to this interrogatory or a relevant time period. Subject to such objections, Lindsey identifies the management agreements between Lindsey and the owners of the apartment properties managed by Lindsey in the States of Alabama, Arkansas, Kansas, Mississippi, Missouri, Nebraska, Oklahoma, Tennessee and Texas. Pursuant to Fed. R. Civ. P. 33(d), Lindsey will produce, upon entry of an agreeable protective order, copies of such management agreements.

**INTERROGATORY NO. 10**:     Within Defendant's Notice of Removal, you contend that Lindsey Management Co., Inc. collects over one million dollars ($1,000,000) per year in liquidated damages "from persons who have entered into residential leases at properties managed by Lindsey Management Co., Inc. in the States of Arkansas, Kansas, Mississippi, Missouri, Oklahoma, Tennessee and Texas." See Affidavit of D. Scott Rogerson at ¶ 3, attached to Notice of Removal as Exhibit 1. Please identify all included properties.

**ANSWER TO INTERROGATORY NO. 10**:     Pursuant to Fed. R. Civ. P. 33(d), Lindsey will produce, upon entry of an agreeable protective order, a list of the residential apartment properties.

**INTERROGATORY NO. 11**:     Within Defendant's Notice of Removal, you contend that Lindsey Management Co., Inc. collects over one million dollars ($1,000,000) per year in liquidated damages "from persons who have entered into residential leases at properties managed by Lindsey Management Co., Inc. in the States of Arkansas, Kansas, Mississippi, Missouri, Oklahoma, Tennessee and Texas. See Affidavit of D. Scott Rogerson at ¶ 3, attached to Notice of Removal as Exhibit 1. For each of the last five years, please state how much of this money is turned over to another person and/or entity and identify all such person and/or entities.

**ANSWER TO INTERROGATORY NO. 11**:     Pursuant     to     the     Management

Agreement with each owner of the apartment properties managed by Lindsey, Lindsey pays all

revenues generated from each property to the respective owners, subject to deductions provided

for in the Management Agreement.

**INTERROGATORY NO. 12**:     Please   state   all   facts   supporting   your   fourth

affirmative defense.

**ANSWER TO INTERROGATORY NO. 12**:     See Response to Interrogatory No. 1.

**INTERROGATORY NO. 13**:     Please   identify   (by   name,   title,   address,   and

telephone number) all persons with knowledge of the facts supporting your fourth affirmative

defense.

**ANSWER TO INTERROGATORY NO. 13**:     See Response to Interrogatory No. 2.

**INTERROGATORY NO. 14**:     Please   identify   (by   title,   date,   description   and

whereabouts) all documents which constitute, show or reflect the facts supporting your fourth

affirmative defense.

**ANSWER TO INTERROGATORY NO. 14**:     See Response to Interrogatory No. 3.

Respectfully submitted,

Sidney G. Dunagan, OBA #2524
Amy M. Stipe, OBA #18361
Jeremy K. Webb, OBA #21057
GABLE GOTWALS
211 North Robinson, 15th Floor
Oklahoma City, Oklahoma 73102
Telephone:     (405) 235-5500
Facsimile:     (405) 235-2875
sdunagan@gablelaw.com
astipe@gablelaw.com

jwebb@gablelaw.com

*Attorneys for the Defendant*
*Lindsey Management Co., Inc.*

## VERIFICATION

D. Scott Rogerson, being first duly sworn, deposes and states that he is the President of Corporate Operations and Chief Financial Officer for Defendant Lindsey Management Co., Inc., that he verifies the foregoing for and on behalf of the Defendant, and is duly authorized to do so; that the facts and matters set forth herein have been assembled by authorized employees and counsel of Defendant; and that deponent believes that the facts and matters set forth herein are true and correct.

_____
D. Scott Rogerson

SUBSCRIBED AND SWORN TO before me this _____ day of November, 2007.

_____

## CERTIFICATE OF MAILING

I hereby certify that on this 15th day of November, 2007, a true and correct copy of the foregoing document was mailed, postage prepaid thereon, to:

Terry W. West
Bradley C. West
Gregg W. Luther
The West Law Firm
124 West Highland – P. O. Box 698
Shawnee, Oklahoma 74802-0698

     and

Brian R. Strange, Calif. Bar # 103252
12100 Wilshire Blvd., Suite 1900
Los Angeles, California 90025
Attorneys for the Plaintiffs

Sidney G. Dunagan

jwebb@gablelaw.com

*Attorneys for the Defendant*
*Lindsey Management Co., Inc.*

## VERIFICATION

D. Scott Rogerson, being first duly sworn, deposes and states that he is the President of Corporate Operations and Chief Financial Officer for Defendant Lindsey Management Co., Inc., that he verifies the foregoing for and on behalf of the Defendant, and is duly authorized to do so; that the facts and matters set forth herein have been assembled by authorized employees and counsel of Defendant; and that deponent believes that the facts and matters set forth herein are true and correct.

D. Scott Rogerson

SUBSCRIBED AND SWORN TO before me this 14th day of November, 2007.

OFFICIAL SEAL
KAREN McCOY
NOTARY PUBLIC ARKANSAS
WASHINGTON COUNTY
MY COMM. EXPIRES 6/ 01/

Notary Public

## CERTIFICATE OF MAILING

I hereby certify that on this 14th day of November, 2007, a true and correct copy of the foregoing document was mailed, postage prepaid thereon, to:

Terry W. West
Bradley C. West
Gregg W. Luther
The West Law Firm
124 West Highland – P. O. Box 698
Shawnee, Oklahoma 74802-0698

Attorneys for the Plaintiffs

Sidney G. Dunagan

S146786;2}9

# EXHIBIT C

## MANAGEMENT AGREEMENT

## THE GREENS AT MOORE APARTMENTS
## MOORE, OKLAHOMA

This Agreement is made this 31st day of January, 2001, between **The Greens at Moore, a Limited Partnership**, organized and existing under the laws of the State of Arkansas, hereinafter "Partnership," and **Lindsey Management Co., Inc., an Arkansas corporation**, hereinafter "Management Agent," to be effective as of the 1st of February, 2001, hereof, hereinafter called the "Effective Date," and in consideration of the mutual covenants and agreements contained herein, the parties hereby agree as follows:

### ARTICLE I
### EXCLUSIVE AGENCY

(A)   APPOINTMENT. The Partnership hereby appoints Management Agent exclusively to lease, operate, and manage the property known as The Greens at Moore Apartments, consisting of 360 apartment units, located at Moore, Oklahoma (hereinafter "Property"). Management Agent hereby accepts the appointment.

(B)   TERM. The term of this Agreement shall commence with the Effective Date and end on the 31st day of January, 2026, hereinafter referred to as "the Initial Term," and this agreement shall thereafter be automatically renewed for annual periods, hereinafter referred to as "Renewal Periods." The Partnership agrees that the only reason for not renewing this Agreement shall be the occurrence of one or more of the events set forth in Article I(C) hereof.

(C)   TERMINATION.

  (I)   The Partnership may terminate this Agreement in the event:

   (i)   Management Agent is in default in the due observance or performance of any material provision of Article II of this Agreement and such default shall have continued for a period of ninety (90) days after written notice has been given to Management Agent specifying such default and demanding that the same be cured.

   (ii)   Management Agent willfully violates any law, regulation or order applicable to the Partnership which has a material adverse financial impact on the Partnership or the Property (provided, however, if such violation is of a

1

CONFIDENTIAL
Lindsey_00662

nature which can be cured by Management Agent within ninety (90) days, such violation will not constitute a right of termination).

(iii)    Management Agent becomes bankrupt.

(iv)    Management Agent commits an act of fraud, deceit, gross negligence or waste, wilful misconduct or a wrongful taking or property from the Partnership.

(v)    Management Agent's performance is not in keeping with professional standards in the industry.

(2)    The Partnership may terminate this Agreement contemporaneously with the sale or other disposition of its interest in the property to any person or entity which is not an affiliate of any Partner of the Partnership, if such sale or other disposition results in the complete satisfaction of (a) any mortgage loan for which the Management Agent or any affiliate of the Management Agent or J.E. Lindsey Family Limited Partnership, Lindsey Investments, a Limited Partnership, Rutledge Properties, a Limited Partnership, Walter L. Harber Family Limited Partnership, Roy E. Stanley Family Limited Partnership, Philip Baer Investments, a Limited Partnership, or James E. Lindsey, are personally liable on or guarantee; and (b) any other Promissory Note or other obligation, other than this Agreement, issued by the Partnership to Management Agent or an affiliate of the Management Agent or James E. Lindsey.

(3)    On the Effective Date of termination, the Management Agent shall turn over to Partnership (i) all books and records relating to the Property (copies of which may be made and retained by the Management Agent at Management Agent's cost and expense); (ii) cash in the amount equal to all security deposits of tenants of the property; (iii) an assignment of any escrow accounts in form approved by the depositors or holder thereof; (iv) executed originals of all leases related to the Property, all extra promotional brochures, forms, posters, signs, and stationery, and all engraved plates and artwork used or remaining in Management Agent's possession, together with such authorizations and letters of direction addressed to tenants, occupants, suppliers, employees, banks and other parties as the Partnership may reasonably require, and Management Agent shall cooperate with Partnership in the transfer of management responsibilities to Partnership or its designee.

(4)    The termination of this Agreement (whether by expiration of time or by either party prior thereto) shall not prejudice the rights of either party against the other for any default or breach of this Agreement. The rights and remedies herein granted are cumulative and in addition to the rights and remedies provided by law; the exercise by either party of one or more rights or remedies shall not impair its right to exercise any other right or remedy.

2

CONFIDENTIAL
Lindsey_00663

## ARTICLE II
## MANAGEMENT AGENT'S DUTIES

(A) MANAGEMENT AGENT'S DUTIES. Management Agent hereby accepts the following responsibilities, authority and duties relative to the Property, and agrees:

   (1) Leasing of Property. To use due diligence and best efforts in the management of the Property for the period and upon the terms herein provided, and to agree to furnish the services of its organization for the leasing, operating and managing of the Property.

   (2) Budget. To prepare an annual budget in connection with the operation of the Property for each succeeding fiscal year of the Partnership, and shall deliver the same to the Partnership sixty (60) days prior to the end of the current fiscal year. Such budget shall not be adopted without consent of the general partner of the Partnership which consent shall not be unreasonably withheld. The Management Agent shall not make an expenditure of funds or commit to make any such expenditure other than in response to an unavoidable event, except as provided for the annual budget so approved by the general partner of the Partnership without the prior consent of the general partner.

   (3) Books and Records. To maintain in a manner customary and consistent with generally accepted accounting principals, books, and records of all receipts and disbursements incurred in the operation and management of the Property. Management Agent shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contracts, operations, and conditions of the Property. To deliver to the Partnership, on or before twenty-five (25) days following the end of each calendar month, (i) an unaudited income and expense statement showing the results of the operation of the Property for the preceding calendar month and fiscal year to date; and (ii) cash balances for reserves and operating accounts as of the last day of such month. To deliver to the Partnership within thirty (30) days after the end of each fiscal quarter (the "Quarterly Reports"), an income and expense statement as of the end of such quarter and the results of the operation of the Property during such preceding quarter. To deliver to the Partnership within forty-five (45) days after the end of each fiscal year, (the "Annual Report"), an income and expense statement as of the end of such fiscal year and the results of the operation of the Property during such preceding fiscal year. Management Agent shall cooperate with the Partnership's accountants in the preparation of audited financial statements. All books of account and business records pertinent to the management of the Property shall be open to inspection by the Partnership or its representative at all reasonable times for the purpose of audit or duplication. All books and records relative to the Property shall be and remain the books and records of the Management Agent during the term of this Agreement, and

3

CONFIDENTIAL
Lindsey_00664

shall be released to the Partnership upon the expiration or termination of this Agreement, subject to Management Agent's right to duplicate and retain the same until all sums due Management Agent are paid.

(4)   Bank Accounts.  To establish and maintain in the name of the General Partner in a commercial bank account acceptable to the Management Agent a separate account for the deposit of all revenues of the Property.  To deposit all receipts collected for the Partnership (less any sums properly deducted or otherwise provided for herein) in said account.  All deposits shall not be commingled with the funds of any other person and shall not be used except for the business of the Property.  It is agreed that Management Agent shall have the authority, singly, and without the joiner of the Partnership or the General Partner, to draw on said account, for any payments that Management Agent must make to discharge the duties, responsibilities, liabilities, or obligations incurred pursuant to this Agreement, and expressly for the payment of the fee due Management Agent.  All payments shall be subject to the limitations of this Agreement.  Notwithstanding anything contained herein to the contrary, Management Agent shall not be responsible for, or liable in the event of, the bankruptcy or the failure of the depository bank.

(5)   Independent Contractor.  Management Agent shall be deemed to be an Independent Contractor.  Nothing contained in this Agreement shall be regarded as creating any relationship, employer-employee, joint venturer, partner, shareholder, or the like between the parties other than as set forth in this Agreement.

(6)   Loans.  To use due diligence and best efforts to comply with all the terms and provisions of the mortgage loan to the Partnership which is secured by the Property and any loan documents related thereto.

### ARTICLE III
### MANAGEMENT AGENT'S AUTHORITY

The Partnership hereby grants to the Management Agent the following authorities and powers and agrees to assume the expenses in connection therewith, to-wit:

(A)   LEASING.  Where applicable, to advertise the availability of the Property or any part thereof for lease; and to display "for lease" signs thereon; to organize, manage, supervise, and conduct all leasing operations; in the ordinary course of business to sign, renew, extend and/or cancel leases or rental agreements for the Property, or any part thereof; to screen and qualify and to set such standards for the screening and qualifying of all leases.

(B)   RENTAL COLLECTIONS.  To collect rents and all other revenues due or to become due the Partnership and to give receipts therefor; to collect tenant's security deposits and deposit same in a bank account and to comply with applicable state and local laws concerning the

4

CONFIDENTIAL
Lindsey_00665

Partnership's responsibility for security deposits and interest thereon, if any; in the ordinary course of business to terminate tenancies of all types and to sign and serve in the name of the Partnership such notices as are appropriate; to institute and prosecute all legal actions; to evict lessees and to recover possession of the Property or any part thereof; to sue for in the name of the Partnership or the Management Agent, and recover such rents and other sums due; and when expedient, to settle, compromise, and release such actions or suits or reinstate such tenancies. Notwithstanding anything contained to the contrary, any lease executed for the Partnership by Management Agent shall not exceed twelve (12) months, unless prior approval is obtained from the general partner.

(C)  REPAIRS.  To make or cause to be made all necessary repairs and alterations and to purchase required supplies and materials to the extent funds are available from the revenues of the Property, and to pay all bills, accounts and indebtedness relative thereto. Management Agent agrees to secure the prior approval of the general partner on all expenditures in excess of $5,000.00 for any one item, except monthly or recurring operating charges and/or emergency repairs in excess of the maximum, if, in the opinion of the Management Agent, such repairs are necessary to protect and preserve the Property from damage or to maintain the services to the lessees as called for in their leases.

(D)  EMPLOYEES AND INDEPENDENT CONTRACTORS.  To hire, supervise, direct and discharge all employees and/or independent contractors required for the operation, management and maintenance of the Property, and to make all payments for the same from the Partnership's funds. All employees shall be deemed to be employees of the Partnership, except administrative backup personnel of the Management Agent. Reports of withholding, social security, and all other payroll taxes shall be made by the Management Agent under Partnership's United States Federal Income Tax Identification Number. The Partnership agrees to reimburse Management Agent for any expenses it might incur or advance in connection with employees of the Partnership, including workers' compensation insurance coverage. Management Agent shall not, without the prior consent of the Partnership, enter into any contract involving a term of more than one (1) year, without prior approval of the operating general partner.

(E)  SERVICE CONTRACT.  To make contracts for the supply of electricity, gas, fuel, water, sanitary sewer, telephone, janitorial services, trash removal and such other services as the Management Agent shall deem advisable, but any such contract requiring an annual payment in excess of $7,500.00 must be authorized in writing by the Partnership; it is agreed that the Partnership shall assume the obligation of any contract or agreement so entered into at the termination of this Agreement.  Management Agent is authorized on behalf of the Partnership to open various trade accounts in the name of the Partnership or in the name of the Property, and to negotiate and enter into contracts and agreements with suppliers, vendors, merchants, repairmen, professionals, contractors, subcontractors, and the like, in the name of the Partnership or the Property and to disclose to said supplier, vendors, merchants, repairmen, professional, contractors, subcontractors, and the like, that the

5

CONFIDENTIAL
Lindsey_00666

Management Agent is acting on behalf of the Property and/or the Partnership, but any such contract requiring the annual payment in excess of $7,500.00 must be authorized in writing by the general partner of the Partnership. All agreements, contracts, accounts, and other debts, open or incurred for the benefit of the Property and the Partnership, shall remain the agreement, account, debt and contract of the Property and the Partnership, even after the termination of this Agreement, and the Partnership shall be, and does hereby, assume complete responsibility for such obligation incurred on its behalf. All contracts for repairs, capital improvements, goods and services shall be awarded at no higher than prevailing market rates. For (a) amounts exceeding either $7,500.00 or (b) $15,000.00 aggregately in any 90-day period all such contracts shall, unless otherwise required or permitted by the Partnership, be awarded on the basis of competitive bidding, solicited in the following manner:

(1)   A minimum of three (3) bids shall be required.

(2)   Bid quotes must be uniform in nature.

(3)   Management Agent may accept a low bid without prior written approval from the Partnership, if the expenditure is for a budget approved item and will not result in an excess of annual budgeted accounting category of the applicable approved budget. Otherwise, written approval of a bid shall be required by the Partnership before acceptance.

(4)   Management Agent shall not accept other than the lowest bid without the prior written approval of the Partnership. If Management Agent advises acceptance of other than the lowest bidder, Management Agent shall adequately support, in writing, its recommendations to the Partnership.

(5)   The Partnership shall be free to accept or reject any and all bids.

(F)   LOANS, TAXES AND INSURANCE.   Management Agent is hereby instructed and authorized to service all loans and mortgages on the Property, pay all applicable real estate and personal property taxes, special assessments and other changes affecting the Property, licenses, fees; to furnish proof of payment of all real estate and personal property taxes, including special assessments and other charges, to the Partnership and its mortgagee; to maintain payroll records and to pay payroll taxes and to make all necessary returns required by law; and, to pay from the Partnership's funds such insurance premiums as requested by the Partnership. Notwithstanding anything contained herein to the contrary, the ultimate responsibility for securing insurance shall be the Partnership's. Management Agent shall use its best efforts in assisting the Partnership in securing any appropriate insurance. When requested by the Partnership, Management Agent shall, without charge, except for out-of-pocket expenses (which may include an appropriate tax consultant), render advise and assistance to the Partnership in the negotiation and prosecution of all claims for the

6

CONFIDENTIAL
Lindsey_00667

abatement of property taxes and other taxes affecting the Property, for awards for any taking by eminent domain affecting the Property, and all other government regulations affecting the Property which the Partnership elects to contest.

(G)   APPROVALS FROM THE PARTNERSHIP.   Management Agent shall be deemed to have obtained the approval of the Partnership for the purposes of this Article III upon receiving approval by the general partner of the Partnership.

## ARTICLE IV
## OBLIGATION OF PARTNERSHIP

(A)   EQUAL OPPORTUNITY/FAIR HOUSING.   The Partnership acknowledges that Management Agent is an Equal Opportunity Employer and that Management Agent must also abide by all Fair Housing laws, statutes, ordinances, and regulations. The Partnership shall not request or require Management Agent to do anything contrary to or in contravention of an Equal Opportunity or Fair Housing law, statute, ordinance or regulation. The Partnership specifically acknowledges and agrees that the indemnity provisions as stated herein shall include any and all employment and/or discrimination claims that may be asserted against Management Agent.

(B)   INSURANCE.

(1)   The Partnership, at the Partnership's expense, shall at all times during the term of this Agreement, carry and maintain the following insurance coverage for the protection of the Partnership and Management Agent. The Partnership shall furnish Management Agent with certificates of duplicates of said insurance policy or policies, which policies shall be issued by companies qualified and authorized to do business within the State of Arkansas.

(i)   General Comprehensive Liability Coverage.   The Partnership shall, at the Partnership's expense, purchase and maintain at all times during the term of this Agreement a general comprehensive liability policy covering general liability risks and exposures, including, but not limited to, the Property and its operations, blanket contractual, personal injury, operations, maintenance, and use of owned, non-owned, or hired automobiles. The limits of which shall be at least $500,000.00 per person and $1,000,000.00 per occurrence for bodily injury, personal injury, and property damage. Such policies shall include Management Agent as an additional insured.

(ii)   Fire Insurance.   The Partnership, at the Partnership's expense, at all times during the term of this Agreement, shall carry fire, extended coverage, vandalism and malicious mischief insurance in such amounts as it deems appropriate, subject to the approval of the Lender. The Partnership shall

7

CONFIDENTIAL
Lindsey_00668

assume responsibility for the replacement and renewal of all such policies, shall make such changes as the Partnership deems appropriate (subject to the approval of the Lender) in connection therewith, and shall supervise the adjustment of any and all losses or claims under such coverage. Management Agent shall have no obligation to insure the property or any of its operations for any loss, claim, action or secure any kind of fire or extended coverage.

(2)     Management Agent, at Management Agent's expense, shall at all times, during the term of this Agreement, carry and maintain the following insurance coverage for the protection of the Management Agent:

(i)     Workers' Compensation. Coverage as required by statute.

Management Agent shall furnish the Partnership with certificates or duplicates of said insurance policy or policies, which policies shall be issued by companies qualified and authorized to do business within the State of Arkansas.

## ARTICLE V
## INDEMNITY

(A)     INDEMNITIES. The Partnership shall indemnify and hold Management Agent harmless from and against all claims, damages and costs (including reasonable attorneys' fees) arising out of or in connection with the management of the Property and the operation thereof, except for the acts of Management Agent taken outside of the scope of its employment and acts of malfeasance, gross negligence or willful misconduct of Management Agent (collectively, "Unauthorized Acts"). Management Agent shall indemnify and hold the Partnership harmless from and against all claims, damages and costs (including reasonable attorneys' fees) arising out of or in connection with Unauthorized Acts. Each party shall endeavor to procure from its insurers waivers of subrogation with respect to claims against the other party under policies in which the other party is not a named insured, provided that such waiver is obtainable without payment of any additional premium.

(B)     Management Agent agrees to promptly inform the Partnership of any claims, fines, suits, proceedings, actions or causes of action of which the Management Agent has notice. It is expressly understood and agreed that the indemnification provisions of Article V shall survive the expiration or termination of this Agreement.

## ARTICLE VI
## COMPENSATION

(A)     MANAGEMENT FEE. In consideration for the services to be rendered to the Partnership by the Management Agent under this Agreement, the Partnership agrees to pay the Management Agent a management fee on an annual basis in an amount equal to 6% of the

8

CONFIDENTIAL
Lindsey_00669

gross receipts from the Apartment Complex. The management fee shall be deducted by the Management Agent on a monthly basis. In any calendar year in which ATRS Properties, LLC, a Limited Partner in The Greens at Moore, a Limited Partnership, does not receive its Guaranteed Priority Distribution (GPD) as provided in the Agreement of Limited Partnership, the management fee paid to Management Agent shall be reduced to the product of 6% and a fraction, the numerator of which is equal to ATRS annualized return for that calendar year and the denominator of which is the GPD. However, the Management Agent's fee shall never fall below 4.5% in any calendar year. The difference between the 6% management fee and the fee paid to Management Agent will accrue if not paid in any given year. Gross revenue for the purpose of the management fee computation will include all income (including fixed and percentage rental and expense reimbursements) except: (1) security deposits unless and not until such deposits are applied as rental income under termination of a lease, (2) rents paid in advance of the date until the month in which such payments are to apply as rental income, (3) sales, finance, refinance, condemnation or insurance proceeds, (4) re-billing of utilities, (5) tenant reimbursement, (6) any payment of any money by a tenant to Owner or Manager in consideration for or in conjunction with the termination, cancellation, expiration, renewal, extension, or modification of such tenant's leases, (7) monies collected for capital items which are paid for by tenants, (8) interest income, and (9) fees paid to the General Partner and Principals by the Partnership.

(B)    PROHIBITIONS ON COMPENSATION.   All rebates, discounts or commissions collected by the Management Agent or credited to Management Agent's use, which relate to the purchasing of supplies or the rendering of services to the Property, shall be fully disclosed to the Partnership and that part of any rebate, discount or commission that is allocated to the purchasing of supplies or the rendering of services for the Property, shall be credited to the Partnership's account.

## ARTICLE VII
## COMPLIANCE WITH LAWS, LICENSES AND PERMITS

(A)    Management Agent shall be responsible for full compliance with state and municipal laws, ordinances, regulations and orders relative to the leasing, use, operation, repair, and maintenance of the Property and with the rules, regulations, and orders of the local Board of Fire Underwriters or other similar bodies.  Subject to the other terms and provisions of this Agreement, Management Agent shall promptly remedy any violation of any such law, ordinance, rule, regulation, or order which comes to its attention.

(B)    Management Agent shall apply for, obtain and maintain, in the name and at the expense of the Partnership, all licenses and permits (including any deposits and bonds) required of the Partnership or Management Agent in connection with the management and operation of the Property.  The Partnership agrees to execute and deliver any and all applications and other documents and to otherwise cooperate to the fullest extent with Management Agent in applying for, obtaining, and maintaining such licenses and permits.

9

CONFIDENTIAL
Lindsey_00670

## ARTICLE VIII
## NOTICES

(A)     All notices, demands, request or other communications, except as otherwise stated in Article III(G), which may be or are required to be given, served or sent by either party to the other, shall be in writing and delivered personally or by Certified Mail, Return Receipt Requested, with postage prepaid at:

Partnership:

> The Greens at Moore,
> A Limited Partnership
> Attn: James E. Lindsey
> 1165 Joyce Boulevard
> Fayetteville, Arkansas  72703

Management Agent:

> Lindsey Management Co., Inc.
> Attn: Roy E. Stanley
> P.O. Box 13000
> Fayetteville, Arkansas  72703

A party may change the name or address for the giving of notice provided above by written notice to the other party.

## ARTICLE IX
## MISCELLANEOUS

(A)     ARKANSAS LAW.  This Agreement shall be construed under and in accordance with the laws of the State of Arkansas.  All monies or sums due Management Agent shall be due and payable to Management Agent at its office in Fayetteville, Arkansas.

(B)     PARTIES BOUND.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

(C)     LEGAL CONSTRUCTION AND SEVERABILITY.  In case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable, in any respect, such invalidity, illegality or unenforceability, shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

10

CONFIDENTIAL
Lindsey_00671

(D)   PRIOR AGREEMENTS SUPERSEDED.   This Agreement contains the sole and only agreement of the parties hereto, and it supersedes any prior understandings or agreements, whether written or oral, between the parties respecting the within subject matter.

(E)   ATTORNEYS' FEES.   If any action at law or in equity, including an action for declaratory judgment, is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees from the other party, which fees may be set by the Court in the trial of such action or may be enforced in a separate action brought for that purpose and which fees shall be in addition to any other relief which may be awarded.

(F)   COUNTERPARTS.   This Agreement and all other copies of this Agreement, insofar as they relate to the rights, duties and remedies of the parties, shall be deemed to be one Agreement. This Agreement may be executed concurrently in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(G)   ADDITIONAL REPRESENTATIONS AND AGREEMENTS OF MANAGEMENT AGENT.   Management Agent represents and warrants that its controlling shareholder is James E. Lindsey and, that upon the death of James E. Lindsey, controlling interest in the Management Agent shall thereafter be vested in the J.E. Lindsey Family Limited Partnership, for a period or term which will end no sooner than the term of this Agreement. Management Agent further represents that it presently employs John David Lindsey and James Earl "Lyndy" Lindsey (Employees).   Management Agent agrees that it will not cause the employment of all of the said Employees to be terminated without the prior written consent of the Partnership.

EXECUTED this 31st day of January, 2001.

PARTNERSHIP:

THE GREENS AT MOORE,
A LIMITED PARTNERSHIP

BY: THE GREENS AT MOORE
MANAGEMENT COMPANY, INC.,
General Partner

By: _____
James E. Lindsey, President

11

CONFIDENTIAL
Lindsey_00672

**MANAGEMENT AGENT:**

LINDSEY MANAGEMENT CO., INC.

BY: _____
       Roy E. Stanley, President

CONFIDENTIAL
Lindsey_00673

# EXHIBIT D

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) KEITH FUQUA, an individual;            )
(2) STACEY FUQUA, an individual,           )
on behalf of themselves and all others     )
similarly situated,                        )
                                           )
                        Plaintiffs,        )      Case No. _____
                                           )
VS.                                        )
                                           )      Cleveland County District Court
(1) LINDSEY MANAGEMENT CO., INC., and      )      Case No. CJ-2007-1162-L
(2) – (10) DOES 1 THROUGH 10, inclusive    )
                                           )
                        Defendants.        )

### AFFIDAVIT OF D. SCOTT ROGERSON

I, D. Scott Rogerson, of lawful age, being first duly sworn, do depose and state as follows:

1.      I am President of Corporate Operations and Chief Financial Officer for Lindsey Management Co., Inc., and I have personal knowledge about the matters testified to herein. I make this affidavit in support of Lindsey Management Co., Inc.'s Notice of Removal in the above referenced matter.

2.      At the time of the filing of the above referenced action and at the present time, Lindsey Management Co., Inc. was and is a corporation organized under the laws of the State of Arkansas with its principal place of business in Fayetteville, Arkansas.

3.      Over one million dollars ($1,000,000) in liquidated damages are collected on an annual basis from persons who have entered into residential leases at properties managed by Lindsey Management Co., Inc. in the States of Arkansas, Kansas, Mississippi, Missouri, Oklahoma, Tennessee and Texas. Such liquidated damages are collected pursuant to the

S143486;

liquidated damages provisions complained of in Plaintiffs' Petition in the above referenced matter.

4.     Since 2003, in excess of five million dollars ($5,000,000) in liquidated damages have been collected pursuant to the liquidated damages provisions complained of in Plaintiffs' Petition in the above referenced matter from residents of properties managed by Lindsey Management Co., Inc. in the States of Arkansas, Kansas, Mississippi, Missouri, Oklahoma, Tennessee and Texas.

5.     Oklahoma residents account for less than one-third of the "persons who have entered into residential lease agreements or 'Apartment Lease Contracts'" for properties managed by Lindsey Management Co., Inc. in the states of Alabama, Arkansas, Kansas, Mississippi, Missouri, Nebraska, Oklahoma, Tennessee and Texas.

6.     There are in excess of one-hundred (100) "persons who have entered into residential lease agreements or 'Apartment Lease Contracts'" for properties managed by Lindsey Management Co., Inc. in the states of Alabama, Arkansas, Kansas, Mississippi, Missouri, Nebraska, Oklahoma, Tennessee and Texas.

I declare under penalty of perjury that the foregoing is true and correct.

**Further affiant sayeth not.**

D. Scott Rogerson

Subscribed and sworn to before me this 25 day of July, 2007.

NOTARY PUBLIC

My Commission Expires:

6-01-12

OFFICIAL SEAL
KAREN McCOY
NOTARY PUBLIC-ARKANSAS
WASHINGTON COUNTY
MY COMM. EXPIRES 6/ 01/ 2012

S142486;

- 2 -